## Russell *et al. versus* Kennedy.

66    248
40SC ³ 45

1. A devise was "As to my wife, as she has helped to make the property, it is my will that she should have the Draper place, of 150 and 125 acres of land on the where we now live; and the Smith lot and the Possession lot, to have the use of in the family until July Ann and Clinton has their land set off to them. These other two lots, during her natural life, then to be divided amongst the children, as she direct." *Held*, (1.) That "these other two lots" meant the lots first mentioned: (2.) That the wife took an estate for life with a limited power of appointment amongst the children.

2. The wife devised the "homestead" to one child and made no disposition of the other, which, therefore, went to the children in default of appointment. *Held* to be a valid execution of the power.

3. The execution of the power was the same as if she had made the same disposition of the second lot as took place for default of appointment.

4. An appointment of both lots to one, would have been void.

5. *Quoties in verbis nulla est ambiguitas, ibi nulla expositio contra verba fienda est*, applied.

October 22d 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

[Russell v. Kennedy.]

Error to the Court of Common Pleas of *Erie county:* No. 26, to October and November Term 1870.

The case in the court below was an action of ejectment, commenced January 23d 1867, by Alfred Russell and Julia Ann his wife, Austin J. Kennedy and Madison J. Kennedy, against De Witt Clinton Kennedy, for 3-9 of 200 acres of land in Wayne township.

The land in controversy belonged to Isaac Kennedy, who died leaving to survive him a widow Catharine Kennedy, and nine children, to wit: Sidney Kennedy, Charles Kennedy, Madison J. Kennedy, Betsy Avery, Catharine Campbell, Polly Esther Ware, Austin Kennedy, Julia Ann Russell, and De Witt Clinton Kennedy.

The decedent left a will, dated February 18th 1839, in which were the following provisions, amongst others :—

* * * "As to my property my desire is that my just debts must be paid, and for the remainder of the property to be divided with my wife and children in manner following.

"As to Sidney, my eldest son, he has had 100 acres of land in Chenango county, it is my will he yet should have a gold watch out of my property to keep to remember his father by. Charles, my second son, as he has had the handling of my property and now holds a deed of about 130 or 140 acres of land in Union township, yet I do not wish to forget Charles in my will, is for him to have a gold watch for him to keep to remember his father by. Betsey, my eldest daughter, and her heirs, her children, should have the north 100 acres of land next to Mr. Childs, on which the house stands and they now live, to be a permanent home for them during their natural lives. * * * Madison, my third son, now holds a deed with me for the one-half of the lot we now live on, which was bought with my property, yet it my will is that he should have a gold watch to remember his father by, and stay with and make a good home with his mother. Catharine, my second daughter, as she has had $500 handed over by Charles, yet my will and desire is that she and her heirs should have the Farnum 50 acres, and one-half of the Lull place, which will be 75 acres of land on the Harecreek road, which shall be for her and her children their natural lives. * * * Polly Esther has had, by her husband, Samuel Ware, something like $211, besides Polly Esther's outset to keep house, it is my will and desire Polly Esther should have one-half of the Lull place and 50 acres of the Draper place, where Lewis lived, which will make 75 acres of land for her and her children and her heirs during their natural lives. * * * As to Austin he now lives at home, it is my will and desire as he is under age, he should live at home with the family and behave himself like a child, and at the age of 25 he is to take possession of the Walton place. Which is my desire that it should be kept

[Russell *v.* Kennedy.]

his natural life to make himself a home and his heirs after him. * * * July Ann must have 75 acres of land where my executors sees fit to set off to her, with an outset equal to the rest of the girls. Clinton, my last infant child, is to be educated and stay at home with his mother until 21, then to have a farm equal to the rest of the boys. * * * It is my will and desire that the house that we are now about to build should be a home for my wife and for children and grandchildren with industry. * * * And as to my wife Catharine, as she has helped to make the property, it is my will that she should have the Draper place of 150 acres, and 125 acres of land on the where we now live, and the Smith lot, and Possession lot, to have the use of in the family until July Ann and Clinton has their land set off to them; these other two lots during her natural life, then to be divided amongst the children as she direct; and is to have the use of the Walton lot in the family until Austin takes possession of that." * * *

Julia Ann Russell had 75 acres of the Draper lot set off to her, and Clinton had the north half of the lot No. 2103 set off to him under the will, by deed from the executors.

The widow, Catharine Kennedy, died, having made a will containing this clause:—"And now to De Witt Clinton Kennedy, my own, Catharine Kennedy's youngest child, it is my will and desire that he, De Witt Clinton Kennedy, shall have the homestead farm and house, together with all the buildings on the homestead farm."

The plaintiffs' claim was for their proportion of the homestead lot.

The plaintiffs submitted this point:—

"Under all the evidence in this case, the plaintiffs are entitled to recover, and the verdict must be for the plaintiffs."

The court (Johnson, P. J.) answered the point in the negative, and the verdict was for the defendant.

The plaintiffs took a writ of error, and assigned the answer to their point for error.

*B. Grant,* for plaintiffs in error.—Was the widow's estate a fee or for life with remainder in fee to testator's heirs? A power to sell or part must be strictly executed: McConkey's Appeal, 1 Harris 253; s. c. 8 Id. 268.

*J. C. Marshall* (with whom was *F. F. Marshall*), for defendant in error.—The introductory words of the will are to be considered in its construction: Schriver *v.* Meyer, 7 Harris 87. The power of the widow was absolute: Pennock's Estate, 8 Harris 268.

The opinion of the court was delivered, January 3d 1871, by
SHARSWOOD, J.—The questions which are presented upon this

record depend upon the proper construction of the will of Isaac Kennedy. It is very inartificially drawn. That part which relates to the land in controversy is as follows: "And as to my wife Catharine, as she has helped to make the property, *it is my* will that she should have the Draper place of one hundred and fifty acres, and one hundred and twenty-five acres of land on the where we now live, and the Smith lot and Possession lot to have the use of in the family until July Ann and Clinton has their land set off to them, these other two lots during her natural life then to be divided amongst the children as she direct."

· The first question is, which two lots are intended in the last clause. Four lots or places are mentioned in immediate connection, and the strict grammatical sense of the demonstrative pronoun "these" calls for the last-named or nearest. When "this" and "that" refer to different things before expressed, "this" refers to the thing last mentioned, and "that" to the thing first mentioned: Webster's Dict. *ad verbum.* "These," however, is here qualified by "other," which seems naturally to make the clause relate to "others" than those just mentioned. But besides this verbal construction, he had just limited the two last-named lots "to have the use of in the family until July Ann and Clinton has their land set off to them." He had made no express limitation as to the first two places. It seems most reasonable to conclude that when he proceeds to make another and different limitation for "these other two lots"—he means the two first-mentioned.

The second question is, what estate did Catharine Kennedy take in these two lots? The language is very express and unequivocal, "during her natural life," with a remainder over amongst the children as she directs. That is, an estate for life with a power of appointment amongst the children; not a general but a limited power. It is a cardinal canon of construction, *Quoties in verbis nulla est ambiguitas, ibi nulla expositio contra verba fienda est.* It is true that there are other parts of this will from which it may possibly be inferred from the use of the words "during natural life or lives," that the testator had no very clear understanding of their legal signification or effect. As in the clause of devise to Polly Esther, "for her and her children and her heirs during their natural lives." So in the devise to Austin, "which is my desire that it should be kept his natural life to make himself a home and his heirs after him." We cannot import, however, any of these qualifying phrases into the clause in question. There is nothing whatever in it to indicate that the testator did not mean exactly what he said.

The third and last question is, whether Catharine Kennedy rightly exercised the power vested in her by her husband's will? There were in all nine children. By her will she devised the

whole of .the homestead farm to one of them.   We have not been
furnished in either of the paper-books with a copy of the will of
Catharine Kennedy, as we should have been.   We have a mere
extract containing the devise of the homestead to Clinton Ken-
nedy, the youngest son.   It is admitted, by the agreement filed,
that Julia Ann Russell has seventy-five acres of the Draper lot
set off to her under and in pursuance of the provisions of the
will of Isaac Kennedy.   Whether Catharine Kennedy made any
and what disposition of the remaining seventy-five acres of the
Draper place does not appear.   We must assume that she made
no disposition of them, but left them to descend, as in default of
any appointment the whole would have gone among all the nine
children.   If, then, by her will she had expressly made the same
division amongst the children as was practically accomplished by
this only partial execution of the power—had she given the home-
stead to Clinton and the remaining half of the Draper place to
all the nine children—it could not be denied that it would have
been valid.   She was to divide the two lots amongst the children
as she pleased.   She was not bound to divide each lot separately.
No point has been or probably could be made that the shares of
the nine children in the half of the Draper place would be so
trifling and insignificant as to make the appointment illusory—a
fraud upon the power.   The rule in courts of equity in England
on that subject has been abolished by stat. 1 Wm. IV. c. 46.

At law it was clear that any share, however nominal or illusory,
would satisfy the terms of the power : 2 Sugden on Powers 581.
If this appointment by Catharine Kennedy had been, as it would
seem that it might have been, by deed, leaving her free to execute
the power or not, as she pleased, as to the Draper place—there
are cases in England which establish the validity of such an
execution : Maddison *v.* Andrew, 1 Ves. 57 ; Bristow *v.* Warde,
2 Ves. Jr. 336 ; Wilson *v.* Piggott, Id. 351.   In the last case
Lord Alvanley, then Master of the Rolls, said : " I admit that the
true construction of this power is, that it is for the benefit of all
the children, and an exclusive appointment would not be conform-
able to it.   Supposing it so, the first question is, whether, though
that would be the conclusion, the father might not by separate
instruments provide for each of the objects; and whether any
appointment not comprising all is for that reason void.   I am
glad that I have been furnished with the determination in Bristow
*v.* Warde, which is an express authority, that under such a power,
whether in the ultimate distribution each child must be included
for some share or not, the party may exercise his power by
separate deeds, which do not give to each child a share.   If I
understand the argument, it is that this power, if executed at all,
must be executed *in toto*.   I can understand it in no other way.
Maddison *v.* Andrew has completely decided that partial appoint-

[Russell *v.* Kennedy.]

ments may be made; and upon the cases determined, it is universally admitted that if a substantial share is given to each, it may be by different instruments at different times." Mr. Sugden remarks, citing this case: "The dying without any appointment, as to a part, was considered equal to an actual appointment; and therefore a sufficient share being permitted to descend was deemed tantamount to an appointment, so as to prevent any question of illusion:" 2 Sugden on Powers 586. It would not be easy to draw a distinction between that case and this. Had the homestead been the only subject of the power, can it be doubted that Mrs. Kennedy could have directed 50 acres of it to be set off as a farm for Clinton, leaving the residue to descend as in default of appointment? There being two lots to divide among nine, she executes the power as to one of the lots by giving it to one, and failing to execute the power as to the other, it descends to all the children. In the words of Mr. Sugden, "it is tantamount to an actual appointment of that lot to them." It will be noticed that this opinion proceeds upon the assumption that the power in question was not a power of selection but of division or distribution merely, and had she undertaken to give both lots to one exclusively, the appointment would have been inoperative and void.

Judgment affirmed.